Catherine O'Connor v. Commissioner.
O'Connor v. Commissioner
Docket No. 24206.
United States Tax Court
1954 Tax Ct. Memo LEXIS 324; 13 T.C.M. (CCH) 51; T.C.M. (RIA) 54030; January 22, 1954
Howard B. Crittenden, Jr., Esq., Central Tower, San Francisco 3, Calif., for the petitioner. Leonard A. Marcussen, Esq., for the respondent. TURNER Memorandum Findings of Fact and Opinion TURNER, Judge: The respondent determined deficiencies in income tax against the petitioner for the calendar years 1942, 1943 and 1944 in the respective amounts of $2,226.05, $6,837.81 and $13,034.91, and 50 per cent additions to tax for such years in the amounts of $1,113.03, $3,418.91 and $6,517.45, for fraud with intent to evade tax. The questions for determination are (1) whether petitioner failed to report substantial amounts of income on her return for each of the taxable years; (2) whether rents assigned to pay expenses and principal payments on a mortgage on an apartment house which had been purchased by petitioner were taxable to her; (3) whether any part of the income herein was community income taxable only in part to petitioner; (4) whether the period within which respondent might assess and collect any deficiencies herein has expired under *326 the provisions of section 275 of the Internal Revenue Code; and (5) whether any part of the deficiencies was due to fraud with intent to evade tax. Findings of Fact Some of the facts have been stipulated and are found as stipulated. Petitioner is a resident of San Francisco, California. She filed her income tax returns for the years involved with the collector of internal revenue for the first district of California. On January 1, 1942, and until July 15, 1942, petitioner and Victor Divers were equal partners in the business of operating a tavern and bar at 581 Valencia Street, in the Mission district, in San Francisco. She had acquired her one-half interest in the business in 1940, for $1,000. She became sole owner of the business on July 15, 1942, when she purchased the interest of Divers for $1,600, of which $400 was from her savings and $1,200 was money she had borrowed from the Morris Plan Company of California. Petitioner had borrowed the $1,200 from the Morris Plan Company on April 23, 1942, giving her note, secured by Thrift Account No. 19601, which account was carried in her former name of Catherine N. Larson. The balance in the account at *327 that time was $1,125.79. At December 31, 1942, she had reduced the balance due on the note to $300, which amount she paid in a lump sum on February 2, 1943. In the course of her operations, petitioner always had dice at the bar of her tavern, and many customers would shake "double or nothing" for their drinks. If they won, the drinks were free. If they lost, they paid double. Regardless of the turn of the dice, the advantage was with petitioner, since if she lost she was out only the cost of the ingredients of the drink, not the amount a customer would have paid for the drink served. When petitioner was not present, her bartender would shake the dice with the customers. Petitioner would also roll the dice at the bar with customers for money. Play for money was largely restricted to the years 1943 and 1944. Little, if any, such play occurred in 1942. In addition to the bar from which drinks were served, coin machines were available in the tavern for the diversion of the petitioner's customers. They consisted of a juke box or record playing machine, a pinball machine, and a claw machine. These machines did not belong to petitioner, but were placed there by the owners, under an arrangement *328 whereby petitioner was entitled to fifty per cent [1] of the money played into the machines. The partnership accounts had been kept in a book, referred to herein as the "gray" book. One column purported to show total receipts for each day and a second column the total expenditures or "pay outs" for the day. Other columns, which included among the headings Pur.; Miss.; Equipment; Rent; Adv.; Taxes; and Wages, purportedly carried a breakdown of the total expenditures or total "pay outs" for the day. In the keeping of that book, each partner had checked on the other. After her purchase of Divers' interest in the business of July 15, 1942, petitioner continued making entries in the "gray" book for July 16 through August 23, 1942. She made no entries in the "gray" book after the latter date, and after the thirtieth of July, there were no entries in the total expenditures or "pay outs" column, although there were entries in other columns showing details of some purported expenditures made during the period. Sometime at or about the period *329 mentioned, petitioner opened a new book, referred to herein as the "black" book. In this book she also made entries purportedly covering operations for the period July 16 to August 23, 1942. After the latter date, the "black" book was the only account book maintained by petitioner for the years involved herein. As shown by the entries in the "black" book, the receipts of the business for the period July 16 through August 23, 1942, averaged approximately $17 less per day than the receipts shown for the same period in the "gray" book. In the "black" book, the first column purported to show total receipts for each day of operations as shown by the cash register. It did not show receipts from other sources. There was no column purporting to show total expenditures or total "pay outs" for each day. Entries indicating disbursements were made in columns under varied designations, among which were Liquor; Beer & Wine; Tobacco; Mixers; Food; Loans, Donations, Insurance; Personal; Policeman, Garbage and Garage; Light-Gas; Supplies; Rent; Wages; Taxes; Laundry; Bad Debts; Phone, Advertising. There were no entries showing the inventory of liquor or other stock on hand at the beginning or end of *330 any taxable or accounting period. During the years herein petitioner made entries in the "black" book purporting to represent charitable contributions to the Red Cross, the U.S.O., the Salvation Army, the church and the poor. Most of these entries were false, in that the contributions indicated were not in fact made. The juke box or music box was checked regularly each week by the owner. The checking of the claw and pinball machines was not so regularly done. The profits from the three machines and the winnings from the rolling of the dice at the bar for cash were not run through the cash register, but were put in petitioner's purse or a box kept at the counter. Losses from the rolling of dice for cash were paid from the purse or box, and not from the cash register. No record was kept in the "black" book or otherwise of the profits from the coin machines or of any winnings from gambling operations. The Larson-Divers partnership had a checking account with the Mission Branch of The Bank of California from October 14, 1941, to July 16, 1942, when the account was closed and the balance therein of $593.45 became the opening deposit in the checking account of petitioner. Petitioner's *331 account was in the name of Catherine N. Larson, and was so continued throughout the years herein. From July 16, 1942, through December, 1944, petitioner made deposits in the account on an average of between seven and eight times a month. The deposits ranged from a low of $13.60, on August 16, 1943, to a high of $952.31, on December 26, 1944, the majority thereof ranging between $100 and $400. For the year 1944, the deposits were made more frequently, on an average of nine times a month, and were, on the average, larger in amounts. These deposits were in part of money taken from the cash register through which all bar sales purportedly passed and in part from receipts of which no record was made. From April 23, 1942, to August 22, 1942, petitioner also had a checking account with the American Trust Company. This account was opened on April 23, 1942, with a deposit of $1,404, which included the $1,200 petitioner had borrowed that day from the Morris Plan Company. The account was built up to $2,197.40, at July 2, 1942. A check for $1,550 cleared through the account on July 17, 1942, one day after petitioner had acquired Divers' interest in the tavern business. When the account was closed *332 on August 22, 1942, the balance was $58.12. At the time petitioner's $1,200 note to the Morris Plan Company was paid in full, on February 2, 1943, the balance in Thrift Account No. 19601, which had been pledged as security, was $1,148.23. On April 15, 1943, $750 was withdrawn for the purchase of a bond, leaving a balance of $398.23 in the account. This amount was withdrawn on May 18 and applied with a check for $351.77, drawn on the account at the Bank of California, to make $750 for the purchase of a war bond. Account No. 19601 was reopened on June 22, 1943, with a payment into the account of $2,600; $1,465 was added on August 18, 1943; $200 on August 25, 1943; $1,000 on September 23, 1943; and $228.95 on October 8, 1943. On the latter date, October 8, 1943, $4,750 was withdrawn, leaving a balance in the account of $743.95. Payments into the account of $725 on November 9, 1943, $1,600 on September 28, 1944, and $362.50 on October 25, 1944, plus credits for interest, brought the balance in the account at December 31, 1944, to $3,467.01. Neither the "black" book nor any other record made or maintained by petitioner reflects the above payments into the thrift account or the source *333 of the funds so paid in. Except for a withdrawal of $38 on January 6, 1942, and the withdrawals heretofore described, no withdrawals were made from the account during 1942, 1943, or 1944. For the period herein, interest was credited to the account as follows: To July 1, 1942
$11.08
To January 1, 1943
11.36
To January 1, 1944
20.67
To July 1, 1944
14.89
To January 1, 1945
24.24
The premises at 581 Valencia Street, in which petitioner's business was operated during the years herein, were leased premises. Above the bar were some rooms or apartments, which were also covered by the lease, the entrance thereto being at 579 Valencia Street. For a substantial part of the said years one of these apartments was occupied by petitioner. The others were rented to tenants. For the period from January 1 through July of 1942, the rent collected by the partnership on the said apartments was $426. From August 1 until the end of the year, only one apartment was rented, on which petitioner collected rent for August through December amounting to $90. For 1943, she collected $616 as rent on the apartments, and for 1944, $1,228. None of the amounts so received as rent for the said *334 apartments was entered or shown by the partnership or petitioner in either the "gray" book or the "black" book. To some extent, at least, expenses for water, lights and gas incurred in connection with the renting of the apartments were included among the disbursements listed by the partnership, and by petitioner in the said books. The same was true of that part of the rent paid under the lease which was allocable to the apartments. On August 21 of 1943, petitioner contracted to buy an apartment house at 2710 Baker Street, in San Francisco, for $17,000, of which $7,000 was to be paid in cash. The remaining $10,000 was covered by a deed of trust which had been placed on the property by Herbert Rosenbaum, its owner. Before leaving for duty overseas, Rosenbaum had engaged Maurice Hyman, who was petitioner's attorney, to represent him in all matters, including the sale of the apartment house. Under the arrangement, Hyman became the owner of a one-third interest in the property. Thereafter he negotiated the contract of sale with petitioner and, by its terms, was to collect the rents, pay the expenses and apply the balance to the payment of interest and principal until the $10,000 covered *335 under the deed of trust had been paid. In October, presumably on October 8, petitioner made a payment of $7,000 in cash under the contract and on or about October 15, title to the property was conveyed to her, subject to the outstanding trust. Petitioner had already paid $500 in August, and upon conveyance of title was also given credit for $101.55, being half of the October rents which had been collected from tenants. The $7,500 in cash so paid, plus the $101.55 of October rent, was applied first in satisfaction of the $7,000 cash payment required under the contract, the title expenses and insurance and then to the $10,000 due under the trust, leaving $9,723.37 as the balance of the $17,000 purchase price due and owing at October 15, 1943. The $500 payment made under the contract in August of 1943 was made by check on the Bank of California and was entered in the "black" book, under the column headed Personal. There was no check for or entry in the "black" book to show the cash payment of $7,000 on October 8, or any other date. It does appear that $4,750 was withdrawn on October 8, 1943, from Thrift Account No. 19601 with the Morris Plan Company. For the months of November and *336 December, 1943, the rent collected from tenants of the Baker Street apartments and applied by Hyman pursuant to the contract amounted to $207.50 a month. For the year 1944, the rent collected was $1,775. There were no entries in the "black" book or any other record kept by petitioner showing the amounts collected as rent on the said apartments. In addition to the rents received by Hyman from tenants and applied on the balance due and owing under the trust, petitioner made payments as follows: November 2, 1943
$1,500.47
December 16, 1943
1,000.00
January 1, 1944
1,000.00
January 15, 1944
500.00
January 26, 1944
750.00
February 5, 1944
1,000.00
March 24, 1944
1,500.00
July 6, 1944
1,000.00
July 20, 1944
798.40
The trust was satisfied in full by petitioner's payment of $798.40 on July 20, 1944, although Hyman apparently continued collecting the rents through October. After satisfaction of the trust, however, the balance of the rents remaining after payment of expenses was paid over to petitioner. There is no record either in the "black" book or in the checking account of the above November 2, 1943, payment of $1,500.47. Some substantial portion, *337 if not all, of the said amount was paid in currency which was neither entered in the "black" book nor deposited in the bank. The above payments under dates of December 16, 1943, January 1, 1944, January 15, 1944, January 26, 1944, March 24, 1944, and July 20, 1944, were all made by check and were entered in the "black" book, in the column headed Personal. The July 6, 1944 payment of $1,000 is shown in the "black" book in two $500 payments; one of these $500 payments was made by check. On January 1, 1942, petitioner had no assets other than her one-half interest in the tavern, an autombile on which a balance was still due, $863.79 in Thrift Account No. 19601 with the Morris Plan Company, and her personal effects. At no time during the years herein did she receive any money or property by gift, devise, or bequest, except $13 from the estate of a deceased uncle. In March of 1942, petitioner married William B. Jost. They lived together until sometime in June of 1943. On June 22, 1943, petitioner filed suit for divorce, and on July 22, following, was granted an interlocutory decree. A final decree was entered on October 30, 1944. Except for a short period immediately following their *338 marriage, they lived in one of the apartments over the tavern. At times after the suit for divorce was filed and prior to July 8, 1943, Jost insisted that petitioner allow him to sleep at the apartment and, against her wishes, he did at times sleep in the living room. After July 8, he at all times lived elsewhere. At the time of petitioner's marriage to Jost, he was employed as a driver for Dacus Oil Company, and continued in that employment until August or September. During that period he would assist petitioner at the tavern in his spare time. After leaving the oil company, he was unemployed until June of 1943, when he went to work for Young's Patrol. In the interim, his only work was that of helping petitioner in the tavern. During that period, petitioner provided him with clothes, food, lodging and spending money. While living with petitioner, as above stated, Jost never received any of the profits of the business, as such, or claimed any interest therein as his own. He never assumed or had control or management of the tavern nor of the income or profits therefrom. There was a mutual understanding or agreement between petitioner and Jost that the tavern business in its entirety *339 was her separate property and that the income therefrom was her separate income. In her verified complaint in the divorce proceeding, petitioner alleged that there was no community property. Jost did not enter his appearance or file an answer, and in the interlocutory decree, petitioner's complaint was taken as confessed, by reason of Jost's default. At a later date, Jost filed a motion to vacate the interlocutory decree and for leave to file a proposed answer making a community property claim against petitioner and in her property. The motion was denied and Jost took no further action and made no further claim. On March 15, 1943, petitioner filed a partnership return of income for "Catherine Larson and Victor Divers" for the period "beginning Jan. 1942 and ending July 1942." Partnership net income was reported in the amount of $4,232.10, of which fifty per cent, or $2,116.05, was shown as petitioner's share. For the year 1942, petitioner and Jost filed a joint income tax return on March 15, 1943. Reported therein were the wages of Jost from Dacus Oil Company in the amount of $1,380, and $2,116.05, representing petitioner's share of the Larson-Divers partnership net income. For *340 that part of 1942 after petitioner acquired full ownership of the tavern business, she reported a net loss of $2,556.26. Net income was shown as $777.29, which after application of personal exemptions of petitioner and Jost, left no amount as being taxable. For 1943, petitioner and Jost filed separate income tax returns. On his return, Jost reported $1,105.89 as his gross income, being his wages from "Young Patrol Service." He stated on the return that he and petitioner had separated July 6, 1943. On the line provided to show credit of income tax paid for 1942, he noted, "Wife will take all credit." On her return for 1943, filed on March 15, 1944, petitioner reported $30,782.68 as the total received from the tavern. She reported no other income. Net profit from the business was shown as $8,289.28, and after deducting $255 as contributions and $155 for taxes, net income was shown as $7,879.28. She claimed credit for her sister as a dependent. The tax reported was $1,707.75. On her return for 1944, filed March 13, 1945, petitioner reported total receipts from her business as $31,352.48, and the net profit therefrom as $5,589.08. The only other income reported was $2,484, as rent *341 from "Frame Apartments," and after claiming $480 for depreciation, $1,362.27 for repairs and $638.83 as "other expenses," net return from the apartment was shown as $2.90. After expenses of the business, $586.50 was deducted under the heading "Charities." A standard deduction of $500 was claimed, leaving reported net income at $5,591.98, on which the income tax was shown as $1,131.67. For none of the years did petitioner report opening or closing inventories or the cost of goods sold. Instead, purchases of liquor, beer, wine and supplies during each of the years were deducted from reported total receipts, in arriving at reported net profits, without regard to goods on hand at the beginning and end of the year. The Larson-Divers return of income and the petitioner's income tax returns for 1942, 1943 and 1944 were prepared for her by a public accountant who had written a letter soliciting the business. Each year, a week or two prior to the final date for filing her income tax return for the preceding year, petitioner supplied the accountant with the "black" book. [2] He was not employed to make and did not make an audit for petitioner. In the course of preparing the 1944 return, he *342 noticed or heard something which caused him to inquire whether petitioner was receiving rental income. Just how the rents and the charges thereto as reported were arrived at or determined, is not shown. The same accountant also prepared the Larson-Divers partnership return for the period beginning January 1942 and ending in July, 1942. In the preparation of this return, he had the "gray" book available. Petitioner did not advise the accountant of the income received by her from the coin machines, the shaking of dice, or any other gambling activities, none of which had been entered by her in the "black" book. Neither did she inform him as to the false entries on the said book indicating that she had made contributions to the Red Cross, U.S.O., and the like, in the amounts stated. The "gray" book and the "black" book and other records kept by petitioner, whether shown by her to the public accountant or not, were wholly inadequate *343 for reflecting her income for the years herein. Respondent, in his determination of deficiency for 1942, determined $6,320.77 as petitioner's net profit from business, as against a reported net loss of $2,566.26, making a total increase in the business net income over that reported by petitioner of $8,887.03. He made no change in the $2,116.05 reported by her as her distributive share of profits from the Larson-Divers partnership. He also increased net income by $303, representing rental income, interest of $22.44, and $54.50 representing an overstatement of personal deductions. In his determination for 1943, the respondent increased petitioner's net income over the amount reported by her by $14,280.27, representing the total of $791.28, [3] "income increased per audit of records"; $17,030.71 of other receipts not reported; $324.66, omitted rent income; and $20.67, omitted interest income, less increased business expenses of $3,887.05. The respondent also disallowed the dependency credit claimed by petitioner for her sister. In his determination for 1944, respondent increased petitioner's reported *344 net income by $28,301.10, representing unreported receipts of $22,596.49; unreported interest, $39.13; rent understated, $519; repairs overstated, $218.03; reduction in apartment house operating expenses, by reason of personal occupancy of one apartment, $510.23; adjustment to show cost of goods sold, rents, repairs, and other expenses, as against rents, repairs and other expenses and purchases made during the year as reported, $3,936.32; and decrease in contributions claimed, of $481. Deductions were allowed in an increased amount of $2,821.42. This amount was made up of an increase in salaries and wages of $1,171.90; increase in taxes on business, $26.50; loss from theft, $100; interest on apartment house obligation, $20.37; taxes paid on apartment house, $63.69; state income tax, $44.96; increase in other expenses, $289; and other losses and bad debts, $505. The deficiencies for the three years were due in part to the respondent's use of opening and closing inventories and the resulting determination of cost of goods sold. Petitioner was tried and convicted in the United States District Court for the Northern District of California for willfully attempting to defeat and evade *345 the tax imposed upon her, under the Internal Revenue Code, for the year 1942. At the same time, she was tried on a similar charge for the years 1943 and 1944, but as to those years, the members of the jury were unable to agree upon a verdict. Petitioner's income tax return for each of the years 1942, 1943 and 1944 was false or fraudulent with intent to evade tax and a part of the deficiency for each such year was due to fraud with intent to evade tax. Opinion In section 54 of the Internal Revenue Code, it is provided that "Every person liable to any tax imposed by this chapter * * * shall keep such records, render under oath such statements, make such returns, and comply with such rules and regulations, as the Commissioner, with the approval of the Secretary, may from time to time prescribe." Under the regulations promulgated, section 29.54-1 of Regulations 111, it is required that "Every person subject to the tax * * * shall, for the purpose of enabling the Commissioner to determine the correct amount of income subject to the tax, keep such permanent books of account or records, including inventories, as are sufficient to establish the amount of the gross *346 income and the deductions, credits, and other matters required to be shown in any return under chapter 1." In the instant case, the petitioner has admitted that in each of the taxable years she had substantial amounts of income which were not entered in the "black" book or any other record kept by her and which she did not report on her income tax returns. She also admits that various entries in the "black" book and on her returns indicating contributions to the Red Cross, the U.S.O., and the Salvation Army were false and that such contributions were not in fact made. Sources of unreported income, according to petitioner, included coin machines in the tavern, the rolling of dice with customers and with her business competitors on Valencia Street, and various other gambling activities away from her place of business. It is argued by her counsel that all of her receipts, both at the bar and from other sources, were regularly deposited in her bank account and that the "black" book, her bank statements and canceled checks constituted a complete record of all of her income and that upon examination of those records her correct net income could be determined. The difficulty with that *347 argument is that the evidence is to the contrary. According to petitioner's own testimony, various amounts of her unreported income were received in cash and paid out in cash, and did not appear in the "black" book or pass through her bank account. The bank statements show that during the years in question petitioner made deposits in her checking account in the Bank of California on an average of seven to eight times a month, and in 1944, on an average of nine times per month. To what extent the money deposited was from receipts which had passed through the cash register and to what extent from unrecorded and unreported income, we do not know. In any event, the deposits did not include all of her receipts, and we have no way of knowing the amount by which her actual receipts exceeded those deposits. With respect to disbursements, we have a similar situation. Disbursements were made both in cash and by check. Some were recorded in the "black" book and some were not. Where the unrecorded disbursements were by check, it is possible, in some instances, to draw a conclusion as to whether they were for business or for personal reasons. In other instances, it is not. The extent of the unrecorded *348 disbursements which were made by cash is not shown, and by the same token, we do not know the amount of the unrecorded cash disbursements which were made for business purposes or the amount so made for petitioner's personal pleasure and benefit. It is well settled that where a taxpayer has failed to keep books or records as required by section 54, supra, and the regulations promulgated thereunder, and from which his or her correct income can be ascertained, the Commissioner has the right to look elsewhere for evidence. Burka v. Commissioner, 179 Fed. (2d) 483; Kenney v. Commissioner, 111 Fed. (2d) 374; Bishoff v. Commissioner, 27 Fed. (2d) 91; and Frank M. Wiseley, 13 T.C. 253. See also, Dawley v. United States, 186 Fed. (2d) 978; Bell v. United States, 185 Fed. (2d) 302. The respondent not being able to ascertain the correct income of the petitioner for the years herein from petitioner's books and records, was obliged to search out the needed information and data wherever they might be found, and in the course of investigations, extending over a period of months, his agents examined and checked the "gray" *349 book, the "black" book, petitioner's bank statements, canceled checks and check stubs, and any and all records produced by petitioner. They interviewed persons and firms with which she had done business and individuals with whom she said she had gambled. They had a series of interviews with petitioner and her attorney Hyman and sought to have her check and verify such data and figures as to her operations as they had been able to obtain, and much of the data and figures so assembled were corrobrated or admitted by her and Hyman in the course of the interviews and they initialed or made notations on certain schedules to that effect. On the basis of information so obtained, the respondent determined the deficiencies herein, which deficiencies are prima facie correct, and the burden of proving that her correct net income was other than that on which the deficiencies were computed is on the petitioner. See Kenney v. Commissioner, supra, and the other cases above cited. Except for a few specific items, dealt with hereafter, and aside from the previously discussed claim that all of her receipts were deposited in her bank account, petitioner's contentions generally are that *350 the respondent's determination of her business receipts was arbitrary and that the figures used in constructing her business income are fictitious and have no relation to fact. Not only, however, has petitioner failed to show by records or otherwise the correct amount of her gross income or of her net income for the years herein, but, when we take into account the admissions made in the course of her testimony as to her unrecorded and unreported income, we are not even able to determine what the amount is which she now claims as having been her correct income for those years. One item to which specific argument has been directed is that of the unreported rents paid to Hyman by the tenants of the Baker Street apartments and by him applied first to the cost of operation and then to the principal of the $10,000 trust. The agrument, in effect, is that since she did not assume the trust lien, and during the interval from the date of purchase until the trust was satisfied on July 20, 1944, by her final payment of $798.40, the rents were received not by her but by Hyman and by him applied as indicated, the rents so collected and applied were not her income. In support of this contention, *351 she cites and relies on Hilpert v. Commissioner, 151 Fed. (2d) 929, reversing 4 T.C. 473. The Hilpert case, as there decided, is not this case. The United States Court of Appeals for the Fifth Circuit held that the taxpayer had only a right of redemption, and was not the owner of the property in question. Here, the petitioner was the owner of the property by purchase and Hyman received the rents and applied them for her benefit. In short, she was enriched thereby, the rents having been applied in freeing the property from the charge against it to her financial benefit and gain. See and compare Ward v. Commissioner, 58 Fed. (2d) 757, affirming 22 B.T.A. 352. The respondent in his determination has made allowance for expenses or other items chargeable against the rents received, and the petitioner has not shown error therein. Although vague and indefinite as to amount and other essential details, counsel for the petitioner makes some argument to the effect that she should be allowed some added deductions to cover the cost of entertainment. While on her returns petitioner claimed no deductions specifically designated as covering entertainment *352 expenses, there were one or more items on each return which might have included such expenses, and the respondent, in his determination of the deficiencies herein, made no disallowance with respect thereto. Furthermore, we have no such issue before us. The petition contains no allegation of error with respect to the allowance or disallowance of entertainment expenses. In passing, however, it may be noted that Jost, in his testimony at the second criminal trial, stated that there was not much entertainment, except at the bar. We have no reason to believe the situation was substantially different after Jost left, and, so far as appears, the cost of entertainment at the bar, such as free food and free drinks, was fully covered in respondent's determination of the cost of supplies and the cost of liquor sold. Counsel for petitioner has directed a major portion of his argument to the claim that during a substantial part of the years herein the income from the tavern was community income and only one-half thereof is to be taken into account in determining petitioner's income tax liability for the years before us. In making this argument, he is not altogether clear as to whether in his *353 view the community period contended for terminated with the date of petitioner's separation from Jost, the date of the interlocutory decree of divorce, or the date of the final decree. If our understanding of the law applicable to the facts herein is correct, however, the period for which the claim is made is of no consequence, since in our opinion the income from the tavern was not community income, but was the separate income of petitioner. Furthermore, as to 1942, petitioner and Jost filed a joint return and, under section 51 (b) of the Internal Revenue Code, [4] liability for any deficiency in the tax reported is joint and several. Whatever controlling effect Cole v. Commissioner, 81 Fed. (2d) 485, cited and relied on by petitioner, may have had as to the question of joint and several liability in such a case, it came to an end with the Revenue Act of 1938, when section 51 (b) was enacted. Also, it is well settled that once the election to file a joint return is exercised by a husband and wife, the election is final and may not thereafter be changed. See Lamb v. Smith, 183 Fed. (2d) 938, 943, and the cases there cited. *354 Under section 158 of the Civil Code of California, [5] either the husband or the wife may enter into any engagement or transaction with the other respecting property, which either might if unmarried. And, it has been held that an agreement between a husband and wife, by which the husband relinquishes all claims to the earnings of the wife, is one which relates to the acquisition of property by the wife and is an engagement or transaction respecting property within the meaning of section 158 of the California Code, supra. Wren v. Wren, 100 Cal. 276, 34 Pac. 775. Furthermore, in establishing the existence of such an agreement, "resort may be had to circumstantial evidence. The conduct and actions of the husband with respect to such earnings, indicating that he did not regard them as community property, or that he had relinquished to her the right to dispose of her receipts from that source, would be competent evidence and admissible to prove the agreement." Kaltschmidt v. Weber, 145 Cal. 596, 79 Pac. 272. See also, Perkins v. Sunset Telephone & Telegraph Co., 103 Pac. 190; Larson v. Larson, 15 Cal. App. 531, 115 Pac. 340; Smith v. Smith, 47 Cal. App. 650, 191 Pac. 60; *355 and Pacific Mutual Life Insurance Co. v. Cleverson, 108 Pac. (2d) 405. On the evidence, we are convinced that there was a mutual understanding and agreement between petitioner and Jost that the tavern business was petitioner's separate property and that petitioner's earnings, whether in the operation of the tavern or otherwise, were her separate income. Although under sections 172 and 172 (a) of the Civil Code of California the husband has the management and control of the community property, the contrary was true in the instant case. At no time did Jost assume or have control or management of the tavern business or of the income therefrom. At such times as he assisted petitioner in the operations he accounted to her for the things done and the moneys *356 taken in. The bank account continued in petitioner's former name, Catherine N. Larson, and Jost never at any time had any right or authority to draw checks thereon. Between petitioner and Jost, the business and its proceeds were always treated and handled as belonging to petitioner. The interest of Divers in the tavern was purchased by petitioner with her own money on her own credit. There was some vague or suggestive testimony that Jost's wages for the short period after the marriage during which he continued in the employment of Dacus Oil Company was commingled with petitioner's assets, to the end that the business and its assets were thereafter community property. Not only was this testimony unconvincing, but the entire course of conduct of the parties refutes such a conclusion. There was no such commingling of Jost's funds as to affect the rights of petitioner in the tavern business or its profits. And finally, when the divorce was obtained, Jost defaulted and did not contest petitioner's allegations that there was no community property. It is true that after the interlocutory decree was entered on the basis of such default, Jost did file a motion to reopen the matter and for leave *357 to file an answer making a community property claim, but, according to petitioner's testimony, this was after she had refused his importunations that she take him back as her husband and he was then using threats to the effect that, if she did not, he would take her business away from her. Furthermore, the trial court denied the motion, and Jost never pursued the matter any further. After careful review and consideration of the evidence, it is our conclusion that petitioner has failed to show that the respondent erred in his determination of the deficiencies herein or that her correct net income was in an amount less or other than that on which the deficiencies were determined. In reaching that conclusion, we have not overlooked the argument to the effect that she is entitled to deductions in some unstated amounts to cover gambling losses. The argument made seems to be the aftermath of certain claims of deduction falsely made by petitioner on her returns for contributions to the Salvation Army, the Red Cross, the U.S.O., and other comparable organizations, which contributions were not in fact made and the claims therefor are now admitted to have been false. It was petitioner's final *358 testimony that the amounts in question were in fact gambling losses, which were entered in the "black" book as contributions, for the reason that she did not wish her "bookkeeper" to know that she had sustained such losses through gambling. On the basis of those statements, her counsel argues that she is entitled to gambling loss deductions, under section 23 (h) of the Internal Revenue Code, which provides that "Losses from wagering transactions shall be allowed only to the extent of the gains from such transactions." Obviously, the deductions as they were claimed on the returns would not have been allowable, even though it be assumed that the petitioner finally told the truth when she testified that the amounts falsely denominated contributions to the Red Cross, and the like, covered losses from gambling, since no gains from gambling were reported on the returns; and under section 23 (h), supra, gambling losses are allowable deductions "only to the extent of the gains from such transactions." It is thus apparent that as made on the returns the claim, in effect, would have been claims for the deduction of gambling net losses, which the statute does not permit. *359 It is now said, however, that much, if not most, of petitioner's unreported income was from gambling and that it follows, as a consequence, that her gambling losses, whatever they were in amount, but in any event those falsely claimed on her returns as contributions, are deductible. Frankly, we do not know whether any of the added income now admitted by petitioner and which she failed to report represented gambling winnings. [6] She did so testify, but after hearing her testify and observing her in the course thereof, we are unable to say that her final story is any nearer the truth than her first. We do not know that in each of the taxable years substantial amounts of petitioner's unreported income were not gambling on her part, but from the playing of the coin machines by her customers. Certainly none of the amounts now claimed as gambling losses represented losses from rolling dice for cash at the bar. According to petitioner's own description of her operations in that connection, she paid such losses in cash from her winnings which were neither entered in the "black" book nor reported on her returns. Thus only the net profits from dice at the bar could have been taken into account *360 in the determination here. As a consequence, the most we are able to say with respect to the claim is that petitioner's final story was that she gambled extensively, particularly in the years 1943 and 1944, and that, while she couldn't explain it, she was very lucky and won substantially more than she lost. If such was the case, however, and she was the lucky gambler claimed, we are unable, on the record here, to say that such part of the added income herein as might have resulted from gambling was in excess of her net winnings. A further claim made in petitioner's behalf is that the assessment and collection of the deficiencies are barred, under the provisions of section 275 of the Internal Revenue Code, [7] in that her returns were timely filed and the periods prescribed in that section and within which the respondent might act had expired prior to his determination of the deficiencies herein. It is the claim of the respondent, on the other hand, that the returns were "false or fraudulent * * * with intent to evade tax," and, under *361 section 276 (a) of the Code, [8] the tax may be assessed "at any time." That the returns were false is not a disputed matter. Petitioner has admitted *362 that substantial amounts of income were omitted from her returns and that some of the claims of deduction were false and did not reflect the truth. She denies, however, that the falsity of the returns was due to an intent to evade tax. Her contentions, in the main, are that she did not know that gambling winnings or income from coin machines were taxable income; that for the purpose of having her returns made, she turned all of her records over to an accountant who, she thought, was competent and depended upon him to make correct returns for her, and finally, that such errors as may be attributable or chargeable to her were errors due to ignorance and not due to intent to evade tax. While certain matter appearing in the record could not be taken as a favorable recommendation of the accountant's ability in preparing the income tax returns, we do not believe the petitioner's protestations that she thought she had made a true and correct return of her income and that none of the errors therein was due to any intent on her part to evade tax. We base this conclusion on impressions obtained from seeing and hearing her testify and from our examination of other evidence of record. Her testimony *363 varied from time to time on many of the items involved and at times was in direct contradiction of that given at another [time]. To illustrate, she at first declared that the purported charitable contributions as entered in her "black" book were, in reality, payments to the police and were so made because she did not desire to create a situation wherein the recording of their names or a correct description of the payments might prove embarrassing to them. It was not until later that her testimony was that they represented neither charitable contributions nor payments to the police, but gambling losses. Whatever may have been the shortcomings of her accountant, we are convinced also that the omissions of income from the coin machines or other unrecorded sources were not omissions for which he was responsible, nor due to ignorance on the part of petitioner, but to an intent on her part to evade her just tax. Having so concluded, it follows that there is no limitation the period within which the respondent was authorized and permitted to determine the deficiencies in issue herein. The final issue is whether the respondent erred in his determination of the 50 per cent addition to tax, *364 in each year, for fraud. In section 293 (b) of the Internal Revenue Code, [9] it is provided that if any part of the deficiency is due to fraud with intent to evade tax, then 50 per centum of the total amount of the deficiency, in addition to the deficiency, shall be assessed, collected, and paid. On the evidence of record, we have concluded and found that a part of each deficiency herein was due to fraud with intent to evade tax. What we have said with respect to petitioner's intent to evade tax, in connection with the statute of limitations issue, is equally applicable here. Decision will be entered for the respondent. Footnotes
1. As to petitioner's share of the money played into the juke box, there is some conflict of record as between forty per cent and fifty per cent.↩
2. The testimony of petitioner and the accountant was contradictory as to whether or not petitioner had also supplied him with her bank statements, check stubs and canceled checks. Her testimony was that she did and his testimony was that she did not.↩
3. This amount represented an understatement of sales per the "black" book.↩
4. SEC. 51. INDIVIDUAL RETURNS. * * *
(b) Husband and Wife. - In the case of a husband and wife living together the income of each (even though one has no gross income) may be included in a single return made by them jointly, in which case the tax shall be computed on the aggregate income, and the liability with respect to the tax shall be joint and several. No joint return may be made if either the husband or wife is a nonresident alien.↩
5. § 158. Husband and wife may make contracts. Either husband or wife may enter into any engagement or transaction with the other, or with any other person, respecting property, which either might if unmarried; subject, in transactions between themselves, to the general rules which control the actions of persons occupying the confidential relations with each other, as defined by the title on trusts. [Enacted 1872.]↩
6. The respondent's agents were unable to verify her claims through the individuals with whom she said she had gambled.↩
7. SEC. 275. PERIOD OF LIMITATION UPON ASSESSMENT AND COLLECTION. Except as provided in section 276 - (a) General Rule. - The amount of income taxes imposed by this chapter shall be assessed within three years after the return was filed, and no proceeding in court without assessment for the collection of such taxes shall be begun after the expiration of such period. * * *
(c) Omission from Gross Income. - If the taxpayer omits from gross income an amount properly includible therein which is in excess of 25 per cent of the amount of gross income stated in the return, the tax may be assessed, or a proceeding in court for the collection of such tax may be begun without assessment, at any time within 5 years after the return was filed. ↩
8. SEC. 276. SAME - EXCEPTIONS. (a) False Return or No Return. - In the case of a false or fraudulent return with intent to evade tax or of a failure to file a return the tax may be assessed, or a proceeding in court for the collection of such tax may be begun without assessment, at any time.↩
9. SEC. 293. ADDITIONS TO THE TAX IN CASE OF DEFICIENCY. * * *
(b) Fraud. - If any part of any deficiency is due to fraud, with intent to evade tax, then 50 per centum of the total amount of the deficiency (in addition to such deficiency) shall be so assessed, collected, and paid in lieu of the 50 per centum addition to the tax provided in section 3612 (d) (2).↩